**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| IMPAC FUNDING CORPORATION, AS MASTER SERVICER FOR IMPAC CMB TRUST SERIES 2005-4, | : : : : : : | |
| Plaintiff, | : : | CIVIL ACTION NO. 1:12-CV-873-RWS |
| v. | : : | |
| AMICA MUTUAL INSURANCE COMPANY, | : : : | |
| Defendant. | : | |

### **ORDER**

This case comes before the Court on Defendant's Motion to Dismiss [19] and Request for Oral Argument [1-9] and Plaintiff's Request for Oral Argument [12]. After reviewing the record, the Court enters the following Order.

### **Background**[1]

This case involves a dispute over the payment of insurance proceeds. In or around 2005, Lynn Christopher ("Christopher") obtained a loan (the "Loan")

---

[1] Because the case is before the court on a motion to dismiss, the Court accepts as true the facts alleged in the Complaint. Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1273 n.1 (11th Cir. 1999).

AO 72A
(Rev.8/82)

in connection with the purchase of real property (the "Property"). (Compl., Dkt. [1-3] ¶ 4.) In connection with the Loan, Defendant Amica Mutual Insurance Company ("Amica") issued an insurance policy to Christopher providing certain insurance coverage for the Property (the "Insurance Policy"). (Id. ¶ 6.) The Loan was deposited into the Impac CMB Trust Series 2005-4 (the "Trust"), for which Plaintiff Impac Funding Corporation ("Impac") acts as master servicer and GMAC Mortgage Corporation ("GMAC") acts as sub-servicer. (Id. ¶ 7.) "As the holder of the Loan, the Trust has an interest in any proceeds paid by Amica under the Insurance Policy, and Amica is obligated to pay any such proceeds to, and for the benefit of, the Trust." (Id. ¶ 8.)

"On or around January 3, 2008, the Property sustained certain losses covered by the Insurance Policy (the 'Covered Losses')." (Id. ¶ 9.) Christopher submitted a claim under the Insurance Policy to Amica, seeking to recover for the Covered Losses. (Id. ¶ 10.) Amica issued two checks for the Covered Losses, specifically:

(a) check number 2197005 in the amount of $92,309.61 payable to Disaster Restoration and Consultants and Lynn Christopher and GMAC Mortgage Corporation, Its Successors and/or Assigns and Countrywide Mortgage, ISAOA as Mortgagees (the "First Check"); and

2

>     (b)     check number 2237118 in the amount of $154,690.65 payable to Disaster Restoration and Consultants and Lynn Christopher and GMAC Mortgage Corporation, ISAOA and Countrywide Mortgage, ISAOA as Mortgagees (the "Second Check," and together with the First Check, the "Checks").

(Id. ¶¶ 11-12.)  The Proceeds of the Checks were intended to be used to make repairs to the Property.  (Id. ¶ 13.)

"Although the Checks bear the alleged endorsements of each of the payees, neither GMAC nor anyone on behalf of the Trust received . . . or endorsed either of the Checks."  (Id. ¶ 14.)  Nor were the purported endorsements made by an authorized representative of GMAC or the Trust.  (Id. ¶ 15.)  Similarly, "neither Christopher nor Countrywide Mortgage endorsed either of the Checks, and the alleged endorsements of Christopher and Countrywide Mortgage on the Checks were not authorized to be made by Christopher and Countrywide Mortgage, respectively."  (Id. ¶ 16.)  On the contrary, "Disaster Restoration and Consultants obtained the Checks and forged the endorsements of GMAC, Christopher, and Countrywide Mortgage . . . ."  (Id. ¶ 17.)

After forging these endorsements, Disaster Restoration and Consultants presented the Checks to Branch Banking & Trust Company ("BB&T") for

3

payment. (Id. ¶ 18.) BB&T paid the entire proceeds of both Checks to Disaster Restoration and Consultants, drawing on Amica's account at Sovereign Bank. (Id. ¶¶ 19-20.) Disaster Restoration and Consultants received the proceeds of the Checks but did not perform repairs to the Property. (Id. ¶ 21.) "The Trust has been injured by virtue of the failure to receive any insurance proceeds and the fact that no repairs were undertaken at the Property." (Id. ¶ 23.)

Based on the foregoing allegations, Impac filed suit against Amica, raising claims for breach of contract (Count I) and enforcement of the checks pursuant to O.C.G.A. § 11-3-309 (Count II). (See generally Compl., Dkt. [1-3].) Amica now moves to dismiss the Complaint on grounds that it fails to state a claim for relief or, alternatively, is barred by the two-year contractual statute of limitations to sue contained in the Insurance Policy. (See generally Amica's Mot. to Dismiss, Dkt. [19-1].) The Court sets out the legal standard governing Amica's motion before considering it on the merits.

## Discussion

**I.    Defendant's Request for Oral Argument [1-9] and Plaintiff's Request for Oral Argument [12]**

The Court finds that oral argument is not necessary for the Court to resolve Amica's Motion to Dismiss. Accordingly, the parties' requests for oral argument are **DENIED**.

## II.   Defendant's Motion to Dismiss [19]

### A.   Motion to Dismiss Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." While this pleading standard does not require "detailed factual allegations," "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). In order to withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570). A complaint is plausible on its face when the plaintiff pleads factual content necessary for the court to draw the reasonable inference that the defendant is liable for the conduct alleged. Id.

At the motion to dismiss stage, "all-well pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most

5

favorable to the plaintiff." Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1273 n.1 (11th Cir. 1999). However, the same does not apply to legal conclusions set forth in the complaint. Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009) (citing Iqbal, 556 U.S. at 678). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. Furthermore, the court does not "accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555.

  B. Analysis

  As stated in the Background section, supra, Amica advances two arguments in support of its Motion to Dismiss. Amica first argues that the Complaint fails to state a claim and, second, that the claims raised in the Complaint are barred by the two-year contractual statute of limitations contained in the Insurance Policy. The Court first addresses Amica's statute of limitations defense before turning to its contention that the Complaint fails to state a claim.

    *1.* *Statute of Limitations*

  The parties do not dispute that the Insurance Policy contains a two-year

6

limitation period on filing suit against Amica under the Insurance Policy. Amica contends that this contractual period of limitations began to run when the insurance proceeds allegedly were disbursed improperly, which, in this case, was on February 20, 2008 and March 25, 2008 (the dates the two Checks were issued).  (Amica's Mot. to Dismiss, Dkt. [19-1] at 5 (citations omitted).)  Thus, Amica contends, the contractual period of limitations for claims arising out of the two payments expired on February 20, 2010 and March 25, 2010, respectively, making Impac's Complaint—filed on February 10, 2012—time-barred by almost two years.  (Id. at 5-6.)

Impac does not dispute the legal principles asserted by Amica but contends that under the specific facts of this case, the two-year contractual period of limitations does not apply.  (Mem. of Law in Opp'n to [Amica's Motion to Dismiss][2] ("Impac's Opp'n Br."), Dkt. [9] at 10-19.)  Specifically, Impac argues that the statute of limitations was waived by Amica, and/or that

---

[2] This brief is captioned "Memorandum of Law in Opposition to Defendants' Motions to Dismiss" and was filed in opposition to Amica's Motion to Dismiss and former-Defendant BB&T's motion to dismiss.  BB&T subsequently was dismissed from the suit by consent of the parties.  (Consent Order of Dismissal with Prejudice, Dkt. [17].)

7

Amica should be equitably estopped from asserting it, and/or that the statute of limitations should be equitably tolled. (Id.)

At this stage in the litigation, and in light of representations made by Impac in its brief in opposition to the Motion to Dismiss, the Court finds that it cannot rule as a matter of law that Plaintiff's claims are barred by the contractual statute of limitations. On the contrary, the Court finds that further discovery is warranted on the issue of whether Amica waived the contractual limitations period. The Court reaches this conclusion in light of Impac's representations, discussed below, that Amica led GMAC to believe that a lawsuit was unnecessary.

Specifically, Impac makes the following representations. GMAC first learned about the forged Checks on or about July 16, 2009, after which it immediately contacted Amica to request a forgery affidavit and other information. (Impac's Opp'n Br., Dkt. [9] at 7 (citing GMAC Chronology, Dkt. [10-1]).[3]) GMAC then spent the next eight months discussing and negotiating

---

[3] Impac represents that GMAC had much of the relevant dealings with Amica. (Impac's Opp'n Br., Dkt. [9] at 3 n.1.) Impac further represents that GMAC is a separate and distinct entity from Impac and that Impac, to date, has been able to obtain only limited information from GMAC regarding its dealings with Amica. (Id.) The information Impac has been able to obtain is set forth in a chronology created by or on

the matter with Amica and BB&T in an effort to recover the proceeds of the Checks. (Id. at 3, 7.) Impac contends that through "various misstatements and misrepresentations made by Amica and BB&T, GMAC was falsely led to believe that the Trust would in fact be reimbursed for its losses." (Id. at 3 (citing GMAC Chronology, Dkt. [10-1] at 2-5).) For example, Impac states that on January 6, 2010, Amica advised GMAC that affidavits of forgery had been forwarded to BB&T and that BB&T was considering settling the claims. (Id. at 7 (citing GMAC Chronology, Dkt. [10-1] at 3).)

On February 23, 2010, Amica told GMAC for the first time that its claim had been denied by Amica's bank. (Id. at 8 (citing GMAC Chronology, Dkt. [10-1] at 4).) The next day, GMAC discovered that neither Amica nor Amica's bank had ever contacted BB&T about the forged checks. (Id. (citing GMAC Chronology, Dkt. [10-1] at 4-5).) On February 25, 2010, Amica notified GMAC that the bank denied its claim on grounds that the statute of limitations

---

behalf of GMAC (the "GMAC Chronology"), which Impac presents in support of its opposition to Amica's motion. (Dkt. [10-1].) Impac contends, "Assuming, arguendo, that the Court does not outright deny the [Motion to Dismiss], the fact that Impac has only been able to obtain limited information demonstrates why the Court should deny the [Motion] so that Impac can pursue party and non-party discovery in that regard." (Impac's Opp'n Br., Dkt. [9] at 3 n.1.)

9

had expired.  (Id. (citing GMAC Chronology, Dkt. [10-1] at 5).)  GMAC subsequently learned that BB&T had requested an appraisal and percentage interest worksheet from Amica but that Amica never provided those documents to BB&T.  (Id. (citing GMAC Chronology, Dkt. [10-1] at 5).)  Discussions regarding the Checks continued between Amica and/or BB&T and GMAC until March 26, 2010.  (Id. (citing GMAC Chronology, Dkt. [10-1] at 5).)  Impac filed suit against Amica to recover the proceeds of the Checks on February 10, 2012.  (Compl., Dkt. [1-3].)

In light of the foregoing account of events preceding denial of GMAC's claim, the Court cannot rule as a matter of law that the contractual limitations period is an absolute bar to the claims raised in the Complaint.  See Day v. Burnett, 377 S.E.2d 734, 734 (Ga. Ct. App. 1989) ("Ordinarily, whether a cause of action should be barred by the statute of limitations is a mixed question of law and fact to be decided by a jury."). On the contrary, the Court finds that issues of fact exist as to whether Amica waived the limitations period.  The Georgia courts have held that an insurance company may waive a contractual limitation period on the right to file suit where, by its conduct, it leads the insured to believe that filing suit is unnecessary:

10

> An insurance company may waive the contractual limitation provision where the company leads the insured by its actions to rely on its promise to pay, express or implied. . . .  If the insurer never denied liability, but continually discussed the loss with its insured with a view toward negotiation and settlement without the intervention of a suit, whether or not this lulled the insured into a belief that the [limitation provision] in the contract was waived by the insurer can become a disputed question of fact for the jury.

Auto-Owners Ins. Co. v. Ogden, 569 S.E.2d 833, 835 (Ga. 2002) (internal quotes and citations omitted).  See also Balboa Life and Cas., LLC v. Home Builders Fin., Inc., 697 S.E.2d 240, 244 (Ga. Ct. App. 2010) (same).

In this case, issues of fact exist as to whether Amica waived the contractual limitations period by not denying GMAC's claim and continually negotiating and discussing the matter with GMAC until after the expiration of the limitations period.  Indeed, Impac has presented evidence of representations by Amica that it was taking steps to facilitate settlement of GMAC's claims, e.g., by sending forgery affidavits to BB&T, and that BB&T was considering settling the claims.  This raises a genuine issue of fact as to whether Amica mislead GMAC into believing that its claim would be resolved without the necessity of a suit.  Thus, in light of this question as to whether Amica waived

11

the contractual limitations period, the Court cannot rule as a matter of law that Plaintiff's claims are barred.

### 2. *Failure to State a Claim*

Utilizing the legal standard set out in section A, supra, the Court now considers Amica's argument that the Complaint fails to state a claim upon which relief may be granted, first with respect to Impac's claim for breach of contract and second with respect to its claim for enforcement of the checks, pursuant to O.C.G.A. § 11-3-309.

### i. **Breach of Contract**

In support of its claim for breach of contract, Impac alleges that "[p]ursuant to the Insurance Policy, the Trust, as the holder of the Loan, was entitled to receive any proceeds paid by Amica under the Insurance Policy for damage to the Property, including the amounts paid by Amica for the Covered Losses." (Compl., Dkt. [1-3] ¶ 25.) "After the Property sustained the Covered Losses, the Trust was vested with an interest in any proceeds paid by Amica under the Insurance Policy, including the proceeds of the Checks." (Id. ¶ 26.) Amica issued the Checks pursuant to the Insurance Policy to pay for the Covered Losses, but neither GMAC nor any other entity or person acting on

12

behalf of the Trust received the Checks, endorsed the Checks, or received the proceeds therefrom. (Id. ¶¶ 27-28.) "Because the Trust never received the proceeds of the Checks, Amica remains indebted to the Trust for the amounts of the Checks, pursuant to its obligations under the Insurance Policy." (Id. ¶ 29.)

Amica seeks dismissal of this claim, arguing that its only obligation under the Insurance Policy was to issue payment jointly to the insured and the Trust, which obligation it contends it satisfied by issuing the Checks to GMAC as a joint payee. (Amica's Mot. to Dismiss, Dkt. [19-1] at 3.) Amica argues that the Insurance Policy "imposes no obligation upon Amica to insure that each listed payee on a payment actually endorses same, or that the funds are used as anticipated." (Id.) Thus, Amica contends, "by virtue of the very allegations contained in Plaintiff's Complaint, Amica fulfilled all obligations it owed to Plaintiff under the policy, and any failure of Plaintiff to actually deposit the proceeds of the payments into its account is due solely to the actions of [Disaster Restoration and Consultants], an independent third party . . . ."[4]

---

[4] Amica misconstrues Impac's contract claim as "aris[ing] out of [Disaster Recovery Consultant]'s forging of the endorsements on the subject payments and absconding with the same after cashing them." (Amica's Mot. to Dismiss, Dkt. [19-1] at 3.) Amica continues, "Plaintiff does not allege, nor is there any evidence, that Amica was complicit in or assisted with [Disaster Recovery Consultant]'s actions in

13

(Id. at 3-4.)  In response, Impac argues that Amica was obligated under the Insurance Policy to pay the Trust, not merely to issue the Checks, which were never provided to the Trust.  (Impac's Opp'n Br., Dkt. [9] at 20.)

The relevant provision of the Insurance Policy states as follows: "If a mortgagee is named in this policy, any loss payable under Coverage A or B will be paid to the mortgagee and you, as interests appear."  (Insurance Policy, Part 1, Dkt. [2-1] at 17 of 24, ¶ K.1. (emphasis added).)  The Court agrees with Impac that it has stated a plausible claim for breach of contract based on Amica's failure to pay the Trust in accordance with this provision.  Despite Amica's vehement assertions to the contrary, it has cited no authority for the proposition that an Insurance Company's obligation to pay a loss payee is discharged simply by issuing a check in the payee's name.  By contrast, Impac points to authority for the proposition that a breach of contract claim is viable under these circumstances.  See, e.g., Balboa Life & Cas., 697 S.E.2d at 480-81 (recognizing validity of mortgagee's claim for breach of insurer's contractual

---

wrongfully cashing the same." (Id.)  Contrary to this characterization of Impac's claim, and as stated below, Impac's breach of contract claim does not stem from Disaster Recovery Consultant's actions but from Amica's alleged failure to fulfill its obligations under the Insurance Policy.

14

obligation to pay mortgagee, where insurer issued checks jointly payable to mortgagee and insured and where insured forged mortgagee's endorsement and absconded with proceeds). Accordingly, Amica's Motion to Dismiss is **DENIED** as to this claim.

### ii. Enforcement of the Checks

In support of its claim to enforce the Checks under O.C.G.A. § 11-3-309, Impac alleges the following. The Checks were made payable to both GMAC and Disaster Restoration and Consultants, among other payees. (Compl., Dkt. [1-3] ¶ 32.) Disaster Restoration and Consultants obtained the checks and forged the endorsements of GMAC and the other payees on the Checks. (Id. ¶ 33.) "Due to the forged endorsements of GMAC [and the other payees], Disaster Restoration and Consultants was not a 'holder' of the Checks and was not entitled to enforce the Checks." (Id. ¶ 34.) Moreover, "[b]ecause Disaster Restoration and Consultants was not a 'holder' of the Checks and was not entitled to enforce [them], the payment of the Checks to Disaster Restoration and Consultants did not discharge Amica's obligations to pay the Checks to the payees." (Id. ¶ 35.) Impac finally alleges that the Trust never received the

15

proceeds of the Checks, and that the Checks may be enforced against Amica for the benefit of the Trust. (Id. ¶ 36.)

Amica seeks dismissal of this claim on two grounds. First, Amica contends that although the Checks were issued to all payees, not in the alternative, Disaster Restoration and Consultants nevertheless had an interest in their proceeds as a listed payee. (Amica's Mot. to Dismiss, Dkt. [19-1] at 4.) Second, Amica argues that the Court cannot enter judgment in favor of Impac because Amica is "'not adequately protected against the loss that might occur by reason of a claim by another person to enforce the instrument.'" (Id. at 4 (quoting O.C.G.A. § 11-3-309(b)).)

In response, Impac first argues that Disaster Restoration and Consultants's interest in the Checks is irrelevant because the Check, issued to the payees not in the alternative, could only be negotiated, discharged, or enforced by all of them, not by Disaster Restoration and Consultants individually. (Impac's Opp'n Br., Dkt. [9] at 22 (citing O.C.G.A. § 11-3-110, Cmt. 4).) "Because the Checks were not actually endorsed or negotiated by GMAC," Impac continues, "Disaster Restoration and Consultants's 'interest' in the Checks does not impact Amica's obligations to the Trust under the Checks."

16

(Id.)  Impac attacks Amica's second contention by arguing that Amica does, in fact, have adequate protection "from essentially having to pay twice."  (Id. at 23.)  Impac contends that in the event Amica is required to pay the proceeds of the Checks to the Trust, "[it] can pursue its own claims for indemnity and/or contribution, including against its own bank and Disaster Restoration and Consultants to recover any such losses."  (Id.)

The Court finds that Impac has stated a plausible claim for enforcement of the checks under O.C.G.A. § 11-3-309.  This provision states as follows:

> (a)　　A person not in possession of an instrument is entitled to enforce the instrument if (i) the person was in possession of the instrument and entitled to enforce it when loss of possession occurred; (ii) the loss of possession was not the result of a transfer by the person or a lawful seizure; and (iii) the person cannot reasonably obtain possession of the instrument because the instrument was destroyed, its whereabouts cannot be determined, or it is in the wrongful possession of an unknown person or a person that cannot be found or is not amenable to service of process.
>
> (b)　　. . . The court may not enter judgment in favor of the person seeking enforcement unless it finds that the person required to pay the instrument is adequately protected against loss that might occur by reason of a claim by another person to enforce the instrument.

O.C.G.A. § 11-3-309.

17

While neither party has pointed the Court to any Georgia authority on point, other courts have recognized a cause of action under these circumstances under similar Uniform Commercial Code provisions.  For example, the court in General Motors Acceptance Corporation v. Abington Casualty Insurance Company held that delivery of a check to one co-payee constitutes delivery to the remaining co-payee (or co-payees); thus, the court held, where a check is paid to one co-payee without the endorsement of the other, the other may sue the drawer of the check as the owner of a lost instrument under the foregoing provision.  602 N.E.2d 1085, 1088-89 (Mass. 1992).  Thus, in accordance with this authority, the Court finds that Impac has stated a plausible claim under O.C.G.A. § 11-3-309.

Moreover, the Court agrees with Impac that Amica has adequate protection against being required to, "in essence, 'pay twice'" (Amica's Mot. to Dismiss, Dkt. [19-1] at 4), such that O.C.G.A. § 11-3-309(b) is not a bar to Impac's claim.  As Impac argues, in the event Amica is required to pay the proceeds of the Checks to Impac, Amica may seek to recover its losses from the drawee bank.  See Abington Cas. Ins. Co., 602 N.E.2d at 1089 ("If GMAC [a co-payee] prevails, then [the insurer] will be forced to bring a conversion suit

18

against the drawee bank for payment of the check on a missing endorsement. . . .  The loss, ultimately, must fall on the drawee bank who was in the best position to prevent the error.").  Amica has not argued that this or other remedies would not be available to it, and therefore the Court cannot rule as a matter of law that Impac's claim is barred.

## Conclusion

In accordance with the foregoing, Defendant Amica Mututal Insurance Company's Motion to Dismiss [19] and Request for Oral Argument [1-9] are **DENIED**.  Plaintiff Impac Funding Corporation, as Master Servicer for Impac CMB Trust Series 2005-4,'s Request for Oral Argument [12] is **DENIED**.

**SO ORDERED**, this   18th   day of March, 2013.


_____
**RICHARD W. STORY**
United States District Judge